## Warren Springer v. Fred Schultz, by His Next Friend.

1. PASSENGER ELEVATORS—*Liability of Person Operating is the Same as That of a Common Carrier.*—It is the settled law in this state that the liability of a person operating a passenger elevator is the same as that of a common carrier. Persons operating elevators for raising and

Springer v. Schultz.

lowering persons in buildings are carriers of passengers and subject to the same rules applicable to other carriers of passengers. It is the duty of such carrier of passengers, upon the ground of public policy, to use extraordinary care in and about the operation of such elevators so as to prevent injury to persons therein.

2. SAME—*Happening of Accident Raises a Presumption of Negligence.*—The happening of an accident to a passenger during the course of his transportation raises a presumption that the carrier has been negligent. The burden of rebutting this presumption rests with the carrier.

3. PLEADING—*Not Necessary that the Declaration Should Describe Injuries as Permanent.*—It is enough that the declaration shows the injury received, without describing it in all its seriousness, and the recovery may be to the whole extent of the injury. The permanency of plaintiff's injury is merely evidence to be considered by the jury in determining its severity.

4. NEW TRIALS—*Character of Newly Discovered Evidence.*—To warrant a court in setting aside a verdict, the newly discovered evidence must be such as ought on another trial to produce an opposite result on the merits.

5. SAME—*Where Newly Discovered Evidence is Merely Cumulative.*—Where newly discovered evidence is not conclusive in its character, but is merely cumulative and contradictory of other evidence, or in its nature impeaching, it affords no ground for a new trial.

**Trespass on the Case,** for personal injuries. Appeal from the Superior Court of Cook County; the Hon. GEORGE W. PATTON, Judge presiding. Heard in the Branch Appellate Court at the October term, 1901. Affirmed on remittitur. Opinion filed January 30, 1903.

**Statement.**—Fred Schultz, a minor, brought this suit against Warren Springer, on account of injury received in the fall of a passenger elevator in a six-story building owned by Mr. Springer in Chicago.

Schultz was working for one of the tenants in that building and claims that while he was riding down on the elevator as a passenger, the elevator car fell off the cable and dropped six stories with him on the 24th day of October, 1899, and he was thereby injured.

On the top of the building was a cupola immediately over the elevator shaft in which were two sheaves or grooved wheels, each about thirty-six inches in diameter, set at an angle to each other, in V shape. Over each of these sheaves pass two wire cables, and the elevator car was suspended by

four cables attached to it at its upper part, and passing from it up over the sheaves or wheels at the top of the shaft. Two of these cables, after going over the pulleys, pass down in the sides of the elevators and support counter weights. The other two cables pass down to the basement of the building and around the drum of the steam engine by which the car was raised and lowered.

At the top of the elevator cage, passing through the cross-beam of the car, was a shackle bolt; the upper end or head of this bolt was fan-shaped, containing four holes through which the cables passed and were fastened to the bolt. The bolt passed through the cross-beam, at the top of the cage, and on the lower end of the stem was screwed a nut, thus holding the bolt in place and connecting the cables and the car. The shackle bolt was about seven inches long and in its lower part one and one-half inches in diameter; beneath the thread of the lower end of the bolt was a hole through it about five-eighths of an inch in diameter through which a cotter or clinch-pin could be passed after the nut was screwed up in place, this cotter-pin being an extra precaution to prevent the nut coming off.

The declaration consists of one count and states that the plaintiff, a minor, was a servant of one of the tenants of defendant in his said building; that defendant received the plaintiff to be carried upon said elevator as a passenger, whereupon it became the duty of the defendant to use all due care in the management of said elevator and in keeping the machinery thereof in good care and condition; yet the defendant then and there carelessly and negligently permitted the machinery, engines, brakes, safety-stops, governors, wheels, cables, drums, bolts, nuts, screws, fastenings and various parts of the said elevator to be and remain in bad and defective repair and condition, although by the use of due care defendant could have known of and remedied the same defective repair and condition before the happening of the injury complained of; and defendant so carelessly and negligently ran, managed and operated the said elevator while the plaintiff was with all due care

riding as a passenger thereon, that it fell; whereby plaintiff was greatly injured, etc., and became sick, etc., and has suffered and will hereafter suffer great pain for the term of his life; and thereby divers bones of the plaintiff were broken and dislocated and his mind and nervous system greatly injured and divers internal organs of his body were injured, to the damage of plaintiff in the sum of $25,000.

Issues were joined and a jury trial followed resulting in a verdict of $25,000, upon which judgment was entered.

O. W. Dynes, attorney for appellant; William J. Ammen, of counsel.

Francis J. Woolley, attorney for appellee.

Mr. Justice Burke delivered the opinion of the court.

In this case the jury found the issues for the plaintiff below and assessed his damages in the sum of $25,000, and for this amount judgment was entered. Appellant, Mr. Springer, insists that he was not guilty of the negligence charged, and if guilty, still the verdict was grossly excessive, and at all events, because of newly discovered evidence, he should have been given a new trial.

First: Upon the question of negligence, the entire record of this case must be considered, not to determine upon which side the evidence preponderates, but to learn whether there is evidence substantial and sufficient to sustain the finding of the jury; and if we so find, we will not disturb their verdict and the judgment entered thereon. The plaintiff, Fred Schultz, about eighteen years of age, was at work in the engraving business conducted by a tenant of Mr. Springer on the sixth floor of the Springer Building. At the close of work, about five o'clock in the afternoon of October 24, 1899, with the intention of going home, he stepped into the elevator, then occupied by the elevator operator and three other parties. It appears from the evidence that almost immediately thereafter, while a passenger, and in the exercise of all due care for his own safety, and

without the slightest contributory negligence on his part, the elevator fell from the sixth floor to the basement ,and he was thereby injured as claimed in his declaration. This evidence made out a *prima facie* case for the plaintiff. In case of accidents because of a defect in the machinery or appliances of an elevator, and where the passenger is in the exercise of reasonable care for his own safety, the rule as to the burden of proof is the same as exists against common carriers of passengers. It is the settled law in this state that the liability of a person operating a passenger elevator is the same as that of common carriers. Persons operating elevators for raising and lowering persons in buildings are carriers of passengers and subject to the same rules applicable to other carriers of passengers. It is a duty of such carrier of passengers, upon the ground of public policy, to use extraordinary care in and about the operation of such elevators so as to prevent injury to persons therein. Hartford D. Co. v. Sollitt, 172 Ill. 222; Springer v. Ford, 189 Ill. 430.

The happening of an accident to a passenger during the course of his transportation raises a presumption that the carrier has been negligent. The burden of rebutting this presumption rests with the carrier. Undoubtedly, law requires plaintiff to show that the defendant has been negligent, but where the plaintiff is a passenger in the exercise of reasonable care, a *prima facie* case of negligence is made out by showing the happening of the accident. N. Y. C. & St. L. R. R. Co. v. Blumenthal, 160 Ill. 40.

The fact of the falling of the elevator is evidence tending to show want of care on the part of defendant. Hartford D. Co. v. Sollitt, *supra;* Springer v. Ford, *supra.*

We are next to inquire whether the evidence introduced in the case, fairly considered, shows that the accident was not due to the negligence of defendant as charged in plaintiff's declaration. The evidence is voluminous and we can do no more than call attention to a few of the salient features appearing in a record of most conflicting evidence.

As appears from the statement, the elevator was sus-

pended by cables attached to a bolt which passed through the upper cross-beam of the elevator and was made fast thereto by a nut screwed on the under side of and up against the cross-beam.

Immediately after the accident the nut was found at the bottom of the elevator shaft. The linchpin designed to go through the bolt under the nut to keep it from unscrewing was not found. A large amount of evidence was introduced as to the condition of the elevator and its appearance at the time of and prior to its fall.

Appellant, Mr. Springer, contends that he exercised due care in causing said elevator to be inspected and kept in good and safe condition.

If the linchpin had been in place the nut could not have come off and the elevator would not have fallen. The elevator boy testified that there was no pin through the hole in the bolt while he was there; that the nut was loose and had been for several weeks; that he told the chief engineer to fix it a few minutes before the accident; he felt the elevator shaking; that the cables twisted and he was obliged frequently to go on top of the cage to straighten them.

Another witness testified that within a week or two of the time it fell, the elevator was exceedingly noisy and ran unsteadily; that the inside of the linchpin hole was quite full of rust. A witness testified that about noon on the day of the accident there was no pin in the bolt; that the engineer then turned the cables with a wrench which he put below the nut and with his hand twisted the cables; that about three weeks before the accident he was on top of the elevator and there was no pin in the bolt at that time; that the twisting of the cables was a regular occurrence; and on the day before the accident he told the elevator boy that he "ought to put something in the hole." James Myers, a machinist and city elevator inspector, testified that he made an examination after the accident; that the nut had signs of rust all over it except at the top; that there were no markings of any kind on the bottom of the nut; and that the first thread was torn off; that there is a

slight tendency for the shackle bolt to jar with the running of the cable as well as with the teetering or jarring of the car in its travel. A witness who had frequently operated the elevator stated that " the cables used to twist around and then it was necessary to turn them back again; the nut on the bolt used to get loose and the engineer fixed it; there was no linchpin in the bolt for many weeks before the accident."

On the other hand, as to the condition of the elevator, the defendant introduced witnesses, several of whom were or had been in his employment and whose duty it was to watch and keep the elevator in repair. They testified that the elevator was frequently inspected before and up to the day of the said accident, in all its parts, including nuts, bolts, cotter-pins and other machinery thereof, and always found in good working order. It was denied that the cables became twisted, but admitted that there was some pounding of the engine two or three days before the accident, but it was claimed that the necessary repairs were made on the Sunday before the elevator fell. One witness, who had charge of repairing the Springer elevators, testified that on the day of the accident he tried the nut with a monkey-wrench. He stated the cotter-pin was in; that he had no fear the nut would come off, but did it because it was his custom.

There is a conflict in the evidence as to the twisting of the cables, the vibration of the machinery, the teetering motion of the elevator.

The defendant's evidence tended to show that the nut might work off, and proper precaution required a linchpin in the bolt. A witness was called in rebuttal who testified that he had seen cables attached to a bolt, as in this case, twisted one-quarter way around. In answer to a question by the court put to a witness—who had intimated that the nut would not come off even if there was no linchpin in the bolt—what twisted the nut off, he replied that the nut could work off by not having anything to lock it; the thread being an inclined plane, the nut would certainly

work down; that even the weight of the car on it would tend to twist it off.    Another witness for defendant stated that the whole machine " is full of vibration."    Doubtless sufficient of the evidence has been quoted to show that there is in it an irreconcilable conflict.

The ingenuity of counsel goes far to explain some parts of the evidence.    However, it still remains that the nut was unscrewed down to the last thread, which was stripped off; that the elevator did fall; that no cotter-pin was afterward found about the premises.    The mind can conceive it possible that the  statements of defendant's witnesses,  that a few hours or days before the accident the nut was screwed up tight and that the cotter-pin, properly spread, was in its place, are correct, but the truth of such testimony is highly improbable.    It is within the range of speculation that an enemy of Mr. Springer may have come on the day of the accident and  removed the cotter-pin;  but according to one of his witnesses that would not have been sufficient to have accomplished the diabolical deed, for he stated that the nut without a pin in  its place would not have worked  down. But this evilly-disposed  person must have unscrewed  the nut so that it barely hung by one or more threads.    Another theory indirectly suggested  is that  the linchpin was removed and the nut unfastened to test the Elithorp safety device;  but this theory is without evidence, and in view of the presumption against suicide, is unworthy of consideration.    After a most careful perusal of this record we are forced to the conclusion that Mr. Springer and his employes did not exercise proper care in placing the elevator and its machinery in reasonably safe condition for passengers in the exercise of due care while riding thereon.

Second :  However, appellant insists that if he was proved guilty of the negligence charged in plaintiff's declaration, still, that the amount of the verdict rendered was excessive. To determine the merits of this contention an examination of all the evidence bearing upon the character and extent of appellee's injuries has been made and  the result thereof will be briefly stated.    At the time of receiving the injury

appellee was eighteen years of age and engaged in finishing letters in making brass plates and had been so engaged for two years and upward prior to the accident. After the accident, for some days, he complained of pain in his back and foot, and he received a scar on his nose and eyelid and the left eye was inflamed and so remained for about ten days; and he states that newspaper print at the present time appears blurred to him; that when he attempts to help lift a weight of 100 pounds he suffers in his back; that his right leg was yellow and black up to the knee for a period of seven weeks after the accident, and is now painful when the weather changes; that if he makes a misstep he suffers great pain in it, and walks with a cane; that after the accident he felt heart trouble, but that trouble is now disappearing; that he returned to his work about four months after the accident; that he now receives $8 per week and before the accident $5 per week from the same people. Dr. Camfield, eye and ear specialist, testified that he had examined appellee and found that his left eye was about one-third below the normal standard of vision and in his opinion would not improve. Dr. Venn testified that he attended appellee at about the time of the accident; that he was suffering from an injury to the foot, the hand and the spine; that he had a gash on the eye. The doctor further stated that there is a noticeable curvature of the spine in the dorsal portion thereof of about half an inch outward and half an inch inward; that in his opinion the curvature will not interfere much with the organs inside but will weaken the spine, and that he does not think that the boy can now sit up a whole day without reclining and giving his spine a rest. As to the foot the doctor states that there is a fracture of the bone called the astragulus, the bone which with the shin forms the ankle joint and at the time of the accident the astragulus was broken and slipped back and has now formed an artificial or false joint; this artificial joint will cause great pain and will prevent lateral movement and cause a chronic inflammation of the synovial membrane; that he can not walk very far without sitting down

and that the present condition of the ankle joint is permanent; the doctor further states, as to the future of the young man, that he will not be able to carry burdens on his back, but if he does ordinary physical labor and takes good care of himself, and avoids excessive exercise, and especially if he has any kind of educational pursuit, then that he may " go to the end of his career without his trouble impeding him a good deal." Dr. McGregor, a physician and surgeon, substantially corroborates the foregoing statements of the medical experts. No attempt was made to contradict or disprove the statements of these physicians and surgeons. The existence and seriousness of plaintiff's injuries and the permanency of those in the back and ankle can not be questioned. The opinion of the physicians is that his spine trouble will not improve but rather grow worse; at all events that he can not follow pursuits requiring severe physical labor, and their unqualified opinion is that his ankle is incurable; that its lateral motion is entirely gone, and its forward motion is greatly impaired, and that the ankle is permanently weakened; that the vision of his left eye is permanently reduced one-third below its normal condition; but it is their belief that there are kinds of work, sedentary or intellectual, in which he may experience little difficulty and go to the end of his life with a fair degree of success.

Counsel for appellant has referred to some decisions of this court on the subject of excessive verdicts. This court has never assumed to fix a valuation upon the various parts of the human body, and say that a jury must be governed thereby in determining their verdicts in personal injury cases, but this court has said that the trial judge should correct a verdict which is grossly excessive, and that if the trial court fails to do its duty in this respect, this court will require a remittitur or reverse the judgment where the verdict is excessive.

Counsel for appellant has referred to some holdings in this court as to what amounts of verdict are excessive. In Chicago & N. W. Ry. Co. v. Kane, 70 Ill. App. 676, a verdict of $20,000 for the loss of an arm was held excessive

in the case of a young man twenty years of age who left school at twelve years of age, and who, prior to his injury, worked at paper-hanging for $1 per day.

In the case of C. & E. I. R. R. Co. v. Cleminger, 77 Ill. App. 186, the practice of allowing a remittitur is recognized and followed. This procedure avoids the delay and expense of a re-trial and subserves the ends of justice. It is true, a court has no right to substitute its estimate of damages for that of the jury, but the court does have the right to say that beyond a certain amount there is, in any reasonable view of the case, absolutely no evidence to sustain the amount of damages fixed by the jury. Now, in view of the nature of appellee's injuries, his earning capacity, education and station in life, what maximum verdict could have been recovered beyond which we could say because of the entire want of evidence the jury were not justified in going?

A verdict for $25,000 for the loss of a leg above the knee, by a common laborer, fifty-two years of age, was reduced by remittitur to $15,000, and judgment entered by the trial court and that judgment was affirmed in this court.

In C., M. & St. P. R. R. Co. v. Walsh, 57 Ill. App. 448, a verdict of $29,583 was held excessive, but cured by remittitur down to $16,000. Many cases appear in the books in which judgments have been entered and affirmed in cases where remittiturs of from twenty-five to forty per cent of the original verdicts have been made.

In cases of liability courts are reluctant to disturb the verdict of a jury, founded upon substantial evidence, when the verdict is not so excessive as to imply prejudice or passion on the part of the jury. In the case at bar we are unable to find that anything was done or said to indicate any prejudice or passion on the part of the jury. It is not a matter for surprise that a jury would be quite liberal in assessing the damages in a case where they had evidence to believe that the defendant had been guilty of the negligence charged in this case resulting in transforming the plaintiff from the health and vigor of young manhood

into a cripple unable to bend freely or to walk or stand long upon one of his feet, the spine and several of the internal organs of the body being wrested from their natural position and the sight of one of his eyes reduced one-third below its normal condition.

It frequently happens that jurors, inexperienced in contemplating so serious injuries as those sustained by the plaintiff, and unaccustomed to estimate in money the damages therefor, are, perhaps, disposed to consider what they would take to be deprived of strong feet, of erect spines and of good eyes, and appreciating the almost inestimable value of these parts of the body, assess the damages in a case like the one at bar, at too liberal an amount; therefore, we do not feel, after a thorough examination of this record, that the verdict, though excessive, was inspired by passion or prejudice on the part of the jury; however, considering the earning capacity of plaintiff—that his occupation does not require severe physical labor, and other conditions, we do not find evidence in the record sufficient to warrant the amount of the verdict, but are of the opinion that the jury, to arrive at the excessive amount of their verdict, must have taken, of their own motion, into consideration elements of damage not proper under the evidence of this case.

It is argued that inasmuch as the injuries are not specifically described as being permanent, that therefore the admission of evidence as to the permanence of plaintiff's injuries was improper. There is no force to this objection. It is enough that the declaration showed the injury received, without describing it in all its seriousness, and the recovery could be to the whole extent of the injury. The permanency of plaintiff's injury was merely evidence to be considered by the jury in determining its severity. W. C. St. R. R. Co. v. McCallum, 169 Ill. 240; C. of C. v. Sheehan, 113 Ill. 658; C. C. Ry. Co. v. Hastings, 136 Ill. 251; Eagle Packet Co. v. Defries, 94 Ill. 598.

It follows from the foregoing authorities that the jury was properly instructed as to the measure of damages for permanent injuries.

It is further urged that testimony of injury to the eyesight ought not to have been submitted to the jury because this injury is not specifically pleaded. The declaration charges that the plaintiff was bruised and injured and became sore and disordered, and suffered great pain and will for the term of his life, and that divers bones of his body were dislocated and broken and his mind, brain and nervous system injured, and divers internal organs of his body hurt and injured. It would be difficult to draft or conceive of a more comprehensive averment of all possible injuries to the body, external and internal, than are there set forth. In W. C. St. Ry. Co. v. Levy, 182 Ill. 525, it is said:

" The contention is that the evidence showed that the condition of the optic nerve was produced by defective nutrition and not by any direct injury received in the accident; that it was not the natural and necessary result of the injury, and not having been alleged as special damages it could not be proved. It is not necessary to allege specially every injury to each part of the body in actions of this character. Injury to the back, spine and brain was alleged and the evidence tended to show that such injury was the natural and proximate cause of the defective nutrition to the optic nerve and impairment of the plaintiff's eyesight.

The damages claimed, therefore, were not special but general, and could be recovered without being declared for specially."

The evidence in the case at bar shows that the eyelid was bruised and eye inflamed, and therefore it was fairly inferable that the eye, theretofore sound, was impaired by such injury to it and its covering. The declaration in the cases to which appellant's counsel have referred, limited the charges of injury to some part of the body, and the additional averments of sickness, soreness, and disorder, by fair interpretation in those cases referred to the injuries specifically alleged and were but amplified and general descriptions thereof. Such is not the declaration before us. We are therefore of the opinion that the testimony with reference to the injury to the eye was admissible. We have considered objections to the modifications made by the court

to the defendant's instructions and are of the opinion that no substantial error was committed.

It is urged that remarks prejudicial to the defendant's case were made in the presence of the jury. Counsel for appellee indirectly suggested on the *voir dire* that an insurance company was interested in the case, but owing to the prompt ruling of the court and to the equally prompt disclaimer of the counsel of any knowledge that an insurance company was interested in the suit, we are of the opinion that no damage was thereby done to the defendant. If appellant had feared the effect thereof it would have been entirely competent for him to have asked an instruction and it would have been the duty of the court to have given it, repelling any presumption therefrom prejudicial to him or his case. It did become apparent in the progress of the trial, without the fault of appellee, that the insurance company was interested in the case. Where an insurance company in fact takes the place of the defendant and defends a case it is extremely important for the plaintiff to know fully the relations and feelings of the juror toward the insurance company in order wisely to exercise the right of challenge. It is possible and proper for counsel so to frame questions to jurors as not to state the interest of an insurance company and yet to learn the feelings of the juror toward the company. It is to be noted, however, that the interest of an insurance company can not be completely concealed from an intelligent juror who has been thoroughly interrogated as to his knowledge of and relations to a certain insurance company.

In Sawyer v. Arnold Shoe Co., 38 Atl. Rep. 333, it incidentally appeared from a writing introduced that an insurance company was interested and the court in his charge to the jury called special attention of the jury to the contention that the defendant exercised no care because insured. This charge was held to be error because of its tendency to divert the minds of the jury from the real issue in the case. No such occurrence took place in the case at bar.

In Iroquois Furnace Co. v. McCrea, 91 Ill. App. 337, the

opinion does not state in what manner it appeared that the attorney in that case represented the insurance company, but reads as follows: "It appears that an attorney representing the insurance company was present with the attorneys for appellant at the trial," and there it was held that questions relating to the insurance company were proper for the purpose of enabling counsel to exercise their right of peremptory challenge. In the case at bar it further sufficiently appears from the record that the insurance company was interested in the case. In the light of the evidence in this case we hold that the remarks made by appellee's counsel did not tend to create prejudice against appellant.

Third: It is finally urged that a new trial should have been granted because of newly discovered evidence. To warrant a court in setting aside a verdict, the newly discovered evidence must be such as ought on another trial to produce an opposite result on the merits. 18 Am. & Eng. Ency. of Law, p. 564, and many authorities cited in note; Kendall v. Limberg, 69 Ill. 355.

Where newly discovered evidence is not conclusive in its character but is merely cumulative and contradictory of other evidence, or in its nature impeaching, it affords no ground for a new trial. Appellant should have exercised reasonable diligence during the long period that elapsed between the accident and the trial to have secured all his evidence. Kendall v. Limberg, 69 Ill. 355; Knickerbocker Ins. Co. v. Gould, 80 Ill. 388; Tobin v. People, 101 Ill. 121; City of Paris v. Morrell, 52 Ill. App. 121.

After a careful perusal of the affidavits presented by appellant upon his motion for a new trial, we find no statement therein which is not cumulative, contradictory of testimony on the trial, in its nature impeaching merely, and in no sense, when considered with the evidence in the case, conclusive, or of such nature that we can say that if introduced on another trial on the merits, would change the result. From the abstract it appears that the court did not consider counter affidavits on the motion for a new trial.

Considering the entire record we are of the opinion that the judgment of the Superior Court should be affirmed, provided a remittitur of $10,000 be entered in this court within ten days, otherwise the judgment will be reversed and the cause remanded.